**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



**Russ Kendig
United States Bankruptcy Judge**

**Dated: 03:23 PM August 19, 2020**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| JEANA RENEE HUTSELL, | ) | CASE NO. 18-61474 |
| | ) | |
| Debtor. | ) | ADV. NO. 18-06038 |
| _____ | ) | |
| JEANA RENEE HUTSELL, | ) | JUDGE RUSS KENDIG |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| NAVIENT, et al. | ) | **MEMORANDUM OF OPINION** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I. INTRODUCTION

The primary issue in this student loan dischargeability action centers on whether, and to what extent, courts should consider money received by a debtor as charity for purposes of Brunner v. N.Y. State Higher Educ. Servs. Corp. (In re Brunner), 831 F.2d 395 (2d Cir. 1987). This court previously denied Defendant Education Credit Management Corporation's ("ECMC") motion for summary judgment, holding that a debtor's receipt of noncompulsory charity from a third party should generally be excluded when determining whether the debtor meets the first

prong of the Brunner test. Hutsell v. Navient, No. 18-06038, 2020 WL 1213600, at *6, 7 (Bankr. N.D. Ohio March 9, 2020). Now, Plaintiff has filed her own motion for summary judgment (the "Motion"), which ECMC opposes. For the reasons explained below, the court grants the Motion.

## II. JURISDICTION

The court has subject matter jurisdiction of this case under 28 U.S.C. § 1334 and the general order of reference issued by the U.S. District Court for the Northern District of Ohio. General Order 2012-7. This matter is a core proceeding and the court has authority to enter final orders. 28 U.S.C. § 157(b)(2)(I). Pursuant to 28 U.S.C. §§ 1408 and 1409, venue in this court is proper.[1]

## III. BACKGROUND

### 1. Factual Background[2]

Plaintiff is 47 years old, single, and has no dependents. (Pl.'s Resp. to Def.'s Interrogs. Nos. 3, 8, ECF 32-1.) She lives alone in an apartment and her parents pay her rent. (Id. at 3, 5, 8, 17.) She owns no real property or investments, nor does she own a vehicle. (Id. at 10, 11, 18.) She drives a 2016 Kia Soul, which her parents let her use. (Id. at 18, 20.) The highest level of education she obtained was a high school diploma. (Id. at 1.)

Plaintiff has an extensive history of medical issues. In 1990, Plaintiff was diagnosed with Crohn's disease. (Id. at 21.) She had 3 surgeries within 2 years and now she has a permanent ileostomy. (Id.) Due to her condition, she must use an ostomy bag, which requires "constant upkeep in terms of cleanliness, capacity, and to keep it free from infection." (Id.) Changing her ostomy bag is an "hour long process of showering, sanitizing, and reapplying [her] glue, stoma wafer and then new bag plus of course a complete change of clothes." (Id.)

Occasionally, Plaintiff will suffer infections around her stoma, which prevent her from wearing her ostomy bag and leaving her home. (Id.) She never knows when her bag might break or come loose, but it can happen at any time. (Id.) Her "ostomy also has closed up dozens of times causing bowel obstructions of which [she has] no warning or control." (Id.)

Over the years, Plaintiff has experienced difficulties with employers who have found her "undependable" because she must promptly attend to her medical emergencies. (Id.) It has been challenging for Plaintiff to consistently hold a job and she has had to miss time from work due to illnesses. (Id. at 21, 24; Pl's. Aff. 8, ECF 33; Ex. B to Pl.'s Resp. ECF 35.)

---

[1] Hereinafter, unless otherwise indicated, any reference to a section ("§" or "section") refers to a section in Title 11 of the United States Code (the "Bankruptcy Code").

[2] Plaintiff states that the information in the affidavit and exhibits (Exhibits A-E) she submitted in response to ECMC's motion for summary judgment remain accurate and are incorporated herein. (Pl.'s Aff. 4, ECF 61.)

In 2007, Plaintiff took out a loan to obtain a certification in Chemical Dependency online at Rio Salado. (Pl.'s Aff. 1, ECF 33.) It was a 2-year program, but Plaintiff withdrew because of her health. (Id. at 2.) Also, the program and certification were, in Plaintiff's words, "useless and wouldn't have provided an income that allowed [her] to ever pay the loan back." (Pl.'s Resp. to Def.'s Interrogs. No. 24, ECF 32-1.)

As of February 20, 2020, the total balance of Plaintiff's student loan debt to ECMC is $29,892.38 at a fixed interest rate of 6.8%. (ECMC Supp. Br. 6, ECF 52.) ECMC contends that, over a 20-year period, Plaintiff's payments would be approximately $228/mo. (Id.) ECMC also claims that Plaintiff may be eligible for an income-driven repayment ("IDR") plan calling for $0.00/mo *if the default status of her loans is resolved*. (Id.) Aside from her student loans, Plaintiff has no other outstanding debts. (Pl.'s Resp. to Def.'s Interrogs. No. 19, ECF 32-1.)

In 2008, Plaintiff was diagnosed with thyroid cancer. (Id. at 23.) That same year, her husband left her. (Id.) In May of 2008, Plaintiff's student loans went into default "[d]ue to the health complications [and] personal tragedies [she] had at the time." (Id.) Plaintiff's cancer returned in 2009 and 2012. (Id. at 21, 24; Pl's Aff. 3, ECF 33; Ex. A to Pl.'s Resp., ECF 34; Exs. D1-D10 to Pl's Resp., ECF 37-46.)

Plaintiff claims that she has been unable to pay her student loans ever since she withdrew from school due to a lack of income. (Pl.'s Aff. 6, ECF 33; Ex. A to Pl.'s Resp., ECF 34.) She also claims that she had difficulties finding out where she was supposed to send payments. (Pl.'s Aff. 7, ECF 33; Ex. A to Pl.'s Resp., ECF 34.) From October 2017 to February 2018, she made efforts to determine where she was supposed to send payments but was unable to determine who had her loans. (Id.) At one time, one of Plaintiff's family members had offered to pay her loans in a lump sum if Plaintiff could find out how much she owed, but Plaintiff was unable to even determine who her lender was, let alone how much she owed. (Id.)

Plaintiff currently works at Discount Drug Mart, where she has worked for a little over a year. (Pl.'s Resp. to Def.'s Interrogs. No. 24, ECF 32-1.) She works roughly 37-38.5 hours per week and is unable to work more hours due to her health. (Id.) She makes $12.00 per hour gross and $8.48 per hour net. (Id. at 4.) Her net monthly income is $2,562.83, which includes wages of $1,366.33/mo and $1,196.50/mo in support from her parents. (Id. at 6.) Plaintiff has health care through her employer. (Id. at 7.) On March 16, 2020, Plaintiff took a leave of absence from work because she is immunocompromised and thus at a higher risk of contracting the COVID-19 virus.[3] (Pl.'s Aff. 1, ECF 61, citing Ex. F. to Pl's. Mot.) However, Plaintiff returned to work on May 26, 2020 at the same pay scale as before. (Pl.'s Aff. 2, ECF 61.)

---

[3] "The COVID-19 virus is highly infectious and can be transmitted easily from person to person. COVID-19 fatality rates increase with age and underlying health conditions such as cardiovascular disease, respiratory disease, diabetes, and immune compromise." Wilson v. Williams, 961 F.3d 829, 833 (6th Cir. 2020).

Plaintiff's average monthly expenses are as follows:

| | |
|---|---|
| Rent | $615.00 |
| Electricity | $171.09 |
| Cable & internet | $160.00 |
| Telephone | $40.00 |
| Purchase of new phone $300 | $25.00 |
| Food | $400.00 |
| Clothing (uniforms) | $75.00 |
| Laundry | $40.00 |
| Medical expenses: | |
| -Ostomy supplies | $400.00 |
| -Thyroid medication | $10.50 |
| Personal care products | $40.00 |
| Recreation | $22.99 |
| Transportation | $80.00 |
| Pet supplies | $50.00 |
| Auto insurance | $181.50 |
| **Total** | **$2,311.08** |

(Pl.'s Resp. to Def.'s Interrogs. Nos. 5, 17, ECF 32-1.)[4]  Plaintiff's parents pay for her rent, ostomy supplies, and auto insurance.  (Id.)  Plaintiff states that the support from her parents is a gift which could end at any time.  (Pl.'s. Aff. 5, ECF 33.)

   2. **Procedural Background**

Plaintiff filed a petition for relief under chapter 7 of the Bankruptcy Code on July 20, 2018 and received a discharge on February 1, 2019.[5]  She filed this adversary proceeding on December 26, 2018.[6]  On February 13, 2019, ECMC filed a motion to intervene, which the court granted.  In the motion, ECMC stated that the loans owed by Plaintiff consist of, among other things, a consolidated FFEL Program loan guaranteed by Ascendium Education Solutions, Inc./Great Lakes Higher Education Corporation, which was recently transferred to ECMC.  On March 5, 2019, ECMC answered Plaintiff's complaint, admitting that it is the holder of four of Plaintiff's student loans.

---

[4]  In her answer to interrogatory number 5, Plaintiff states that her auto insurance expense is $181.00 and her cell phone expense is $20.00.  However, Plaintiff lists these expenses as $181.50 and $25.00 respectively in her answer to interrogatory number 17.  It is not clear why these two expense amounts are slightly different.

[5]  Section 523(a)(8) is "self-executing," which means that "[u]nless the debtor affirmatively secures a hardship determination, the discharge order will not include a student loan debt."  Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 450 (2004) (quotation marks and citations omitted).

[6]  A debtor can bring a § 523(a)(8) dischargeability action at any time.  FED. R. BANKR. P. 4007(b).

ECMC previously filed a motion for summary judgment on December 30, 2019, which the court denied on March 9, 2020. Hutsell, 2020 WL 1213600, at *6, 7. The court held that the support Plaintiff receives from her parents should be excluded for purposes of the first prong of the Brunner test. Id. The court also found that genuine issues of fact precluded summary judgment. Id. Plaintiff filed the instant Motion on May 29, 2020, and ECMC responded (the "Response") on June 12, 2020.

## IV. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). If the moving party meets its initial burden, the burden shifts to the non-moving party to establish the existence of a fact requiring trial. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). A fact is "material" only if its resolution will affect the outcome of the proceeding. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. Matsushita, 475 U.S. at 587.

## V. DISCUSSION

Student loan debt is generally non-dischargeable in bankruptcy "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents . . . ." § 523(a)(8).[7] In order to meet the "undue hardship" standard in § 523(a)(8), a debtor must satisfy the Brunner test. To satisfy the Brunner test, a debtor must prove:

> (1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

---

[7] Section 523(a)(8) was enacted as part of the Bankruptcy Reform Act of 1978. Bene v. Educ. Credit Mgmt. Corp. (In re Bene), 474 B.R. 56, 71, n. 15 (Bankr. W.D.N.Y. 2012). As originally enacted, § 523(a)(8) provided that government student loans were not dischargeable in bankruptcy unless: "(1) the loan first became due five years before the bankruptcy filing (excluding deferment period) or (2) excepting the debt from discharge would impose an undue hardship." Id. In 1990, Congress amended the statute by making certain educational benefits and obligations non-dischargeable and extending the five-year period to seven years. Id. In 1998, the statute was amended again to eliminate the seven-year period, thereby excepting all government student loans from discharge unless there was an "undue hardship." Id. Finally, in 2005 Congress amended the statute to include "any other educational loan that is a qualified educational loan as defined in [the Internal Revenue Code]." Id.

5

Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler), 397 F.3d 382, 385 (6th Cir. 2005) (quoting Brunner, 831 F.2d at 396).[8]  The debtor bears the burden of establishing each of these three elements by a preponderance of the evidence.  Barrett v Educ. Credit Mgmt. Corp. (In re Barrett), 487 F.3d 353, 358-59 (6th Cir. 2007).

　　**1. Plaintiff Cannot Maintain, Based on Current Income and Expenses, a Minimal Standard of Living if Forced to Repay Her Student Loans**

　　The first element of the Brunner test "contemplates that a debtor is entitled to maintain a minimal standard of living, which includes basics such as food, clothing, shelter, medical care and transportation for himself and any dependents, before he is required to repay student loan debts."  Murrell v. Edsouth (In re Murrell), 605 B.R. 464, 469 (Bankr. N.D. Ohio 2019) (citations omitted).  Thus, the court should examine the debtor's income and expenses and evaluate what expenses are required to maintain a basic standard of living.  Id. at 469 (citation omitted); see, e.g., Ivory v. U.S. (In re Ivory), 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001) (roughly defining the elements of what is needed for a "minimal standard of living" in modern society).  "After providing for necessary expenses, the court is to determine whether the debtor has income leftover with which to pay his student loan debts."  Murrell, 605 B.R. at 469-70 (citation omitted).

　　Here, Plaintiff receives $2,562.83/mo, but almost half of this ($1,196.50/mo) comes in the form of support from her parents.  (Pl.'s Resp. to Def.'s Interrogs. Nos. 5, 17, ECF 32-1.)  Plaintiff's parents voluntarily pay for her rent, ostomy supplies and auto insurance because of her medical issues and low income.  (Id.)  For the reasons this court has already explained, a debtor's receipt of noncompulsory charity from a third party should generally be excluded when determining whether a debtor meets the first Brunner prong.  Hutsell, 2020 WL 1213600, at *6.[9]

---

[8] Most circuits have adopted some form of the Brunner test.  See Daniel A. Austin, The Indentured Generation: Bankruptcy and Student Loan Debt, 53 SANTA CLARA L. REV. 329, 373-74 (2013).  However, the Brunner test and its application have been heavily criticized.  See, e.g., Rosenberg v. N.Y. State Higher Educ. Servs. Corp. (In re Rosenberg), 610 B.R. 454, 458-59 (Bankr. S.D.N.Y. 2020) (explaining that "[t]he harsh results that often are associated with Brunner are actually the result of cases interpreting Brunner.  Over the past 32 years, many cases have pinned on Brunner punitive standards that are not contained therein."); see also Bruce Grohsgal, Must Bankruptcy Courts Apply the Punitive Gloss of Brunner for the Discharge of a Student Loan?, 39 AM. BANKR. INST. J. 14, 61 (May 2020) (noting that several courts have held that "neither Brunner nor the Bankruptcy Code require a debtor to prove nearly perpetual projected poverty to obtain a fresh start from the burden of student loan debt."); Michael J. Fletcher & J. Jackson Waste, Student Loan Discharge Decisions Poke Holes in the Brunner Test, 33 AM. BANKR. INST. J. 42 (Feb. 2014) ("While the Bankruptcy Code allows discharge of student loans upon a showing of 'undue hardship,' judicial interpretation of that term has set the bar exceptionally high . . . changes to the Bankruptcy Code and a new reality of student borrowing have given rise to a recent groundswell of cases that question Brunner's continued use.").  This court is obligated to apply Bruner because it is the current standard in the Sixth Circuit.  See Chenault v. Great Lakes Higher Educ. Corp. (In re Chenault), 586 B.R. 414, 421 (B.A.P. 6th Cir. 2018) ("Even assuming the time has come to revisit Brunner, unless and until the Sixth Circuit Court of Appeals does so, the bankruptcy courts in this circuit, as well as this Panel, are obligated to apply it.").

[9] Of course, this general rule should not be applied in every case.  For example, it would be inequitable (and antithetical to the purposes of the undue hardship standard in § 523(a)(8)) to apply this rule to a debtor who is able, but not willing, to independently maintain a minimal standard of living and repay his loans but instead chooses to take advantage of the good nature and generosity of others.  See 4 COLLIER ON BANKRUPTCY ¶ 523.14[3] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("At bottom, the Bankruptcy Code requires bankruptcy courts to decide

Thus, after excluding the support from her parents, Plaintiff's monthly wage income from Discount Drug Mart is only $1,366.33. Plaintiff earns $12.00 per hour gross, which is higher than Ohio's current minimum wage of $8.70 per hour. (Pl.'s Resp. to Def.'s Interrogs. No. 4, ECF 32-1.) Plaintiff's annualized gross income of approximately $24,960 (or $16,395.96 net) is less than half the median household income in Ohio, which is $51,297.[10] Plaintiff's income exceeds the 2020 federal poverty level for a household her size, which is $12,760.[11] However, as the Sixth Circuit has explained, debtors "need not live in abject poverty before a discharge is forthcoming." Tenn. Student Assistance Corp., v. Hornsby (In re Hornsby), 144 F.3d 433, 438 (6th Cir. 1998) (citing Rice v. U.S. (In re Rice), 78 F.3d 1144, 1151 (6th Cir. 1996)).

Even when viewing the evidence in favor of ECMC, Plaintiff's income is plainly not enough to cover her rent, ostomy supplies, and auto insurance—essentials for a "minimal standard of living"—let alone repay her student loans. Indeed, ECMC previously conceded that Plaintiff could be eligible for an IDR plan calling for "payments" of $0.00/mo. (ECMC Supp. Br. 6, ECF 52.) If this is true, it supports the notion that Plaintiff cannot afford to maintain a minimal standard of living and repay her student loans under the original note terms. See, e.g., Trejo v. Navient (In re Trejo), No. 17-4052, 2020 Bankr. LEXIS 1030, at *24 (Bankr. N.D. Tex. April 15, 2020) (debtor's inability to maintain a minimal standard of living was supported by the fact that debtor obtained government assistance and was eligible for an IDR plan calling for payments of $0.00/mo). Thus, the court finds that Plaintiff cannot maintain a minimal standard of living if forced to repay her student loans.

In its Response, ECMC does not challenge the reasonableness or necessity of Plaintiff's expenses.[12] Instead, ECMC argues that there is no logical reason why Plaintiff should get summary judgment now because (1) in the previous opinion this court said that genuine factual issues existed with respect to each of the three Brunner prongs, (2) Plaintiff has not presented any new facts in her Motion, and (3) the summary judgment standard requires the court to construe the facts in ECMC's favor. The court disagrees.

From the perspective of ECMC's previous motion for summary judgment, there were factual issues before the court. Now, however, once the noncompulsory charity from Plaintiff's parents is excluded, that is no longer the case. ECMC did not previously seek a decision excluding the charity. More importantly, Plaintiff did not previously file her own motion for summary judgment. Thus, the court did not take the rare step of making Plaintiff's motion for her pursuant to Rule 56(f). See FED. R. CIV. P. 56(f)(1) (providing that the court may grant summary judgment to nonmovant after giving notice and reasonable time to respond); see also

---

how much personal sacrifice society expects from individuals who accepted the benefits of guaranteed student loans but who have not obtained the financial rewards they had hoped to receive as a result of their educational expenditures.").

[10] https://www.justice.gov/ust/eo/bapcpa/20200501/bci_data/median_income_table.htm.

[11] https://aspe.hhs.gov/poverty-guidelines.

[12] Nor did ECMC do so in its previous motion for summary judgment.

Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) (noting that trial courts have the power to issue summary judgment to the nonmovant *sua sponte* if the losing party has proper notice).

### 2. Additional Circumstances Exist Indicating that Plaintiff's State of Affairs is Likely to Persist for a Significant Portion of the Repayment Period of the Student Loans

Regarding the second element, the Sixth Circuit has held that:

> Such circumstances must be indicative of a certainty of hopelessness,[13] not merely a present inability to fulfill financial commitment. They may include illness, disability, a lack of usable job skills, or the existence of a large number of dependents. And, most importantly, they must be beyond the debtor's control, not borne of free choice. Choosing a low-paying job cannot merit undue hardship relief.

Oyler, 397 F.3d at 386 (citations and quotation marks omitted). The debtor must also "precisely identify her problems and explain how her condition would impair her ability to work in the future." Tirch v. Penn. Higher Educ. Assistance Agency (In re Tirch), 409 F.3d 677, 681 (6th Cir. 2005) (citations omitted).

Plaintiff analogizes her situation to the debtor's case in Barrett v Educ. Credit Mgmt. Corp. (In re Barrett), 487 F.3d 353, 358-59 (6th Cir. 2007). In Barrett, a chapter 7 debtor was seeking to discharge approximately $94,751 in student loan debt. 487 F.3d at 356. The debtor suffered from Hodgkin's disease and avascular necrosis, both of which limited his physical capabilities and required him to undergo numerous surgeries. Id. at 357. Because of his poor health, the debtor had difficulties obtaining steady employment. Id. After a trial where the debtor was the sole witness, the bankruptcy court granted the debtor's request to discharge his student loans and the Sixth Circuit Bankruptcy Appellate Panel affirmed. Id. at 358.

On appeal to the U.S. Court of Appeals for the Sixth Circuit, the creditor primarily challenged the bankruptcy court's determination that the debtor satisfied the second and third Brunner prongs. Barrett, 487 F.3d at 360. Regarding the second Brunner prong, the creditor argued that the debtor was required to submit corroborating medical expert evidence before obtaining a discharge. Id. However, the court rejected this argument, explaining that:

---

[13] The "certainty of hopelessness" language has been specifically criticized as going beyond the language of § 523(a)(8) and the Brunner opinion. See, e.g., Krieger v. Educ. Credit Mgmt. Corp., 713 F.3d 882, 885 (7th Cir. 2013) (noting that the "certainty of hopelessness" language "sounds more restrictive than the statutory 'undue hardship[]'"); see also Educ. Credit Mgmt. Corp. v. Polleys, 356 F.3d 1302, 1310 (10th Cir. 2004) (largely adopting the Brunner test but explaining that when "applying [the second] prong, courts need not require a 'certainty of hopelessness.' Instead, a realistic look must be made into debtor's circumstances and the debtor's ability to provide for adequate shelter, nutrition, health care, and the like."); Rosenberg, 610 B.R. at 458-59 (citing cases for the proposition that the punitive nature of the Brunner test, including "the certainty of hopelessness" standard, is largely a result of cases interpreting Brunner rather than the decision itself).

> a requirement of corroborating evidence when Plaintiff is unable to afford expert testimony or documentation imposes an unnecessary and undue burden on Plaintiff in establishing his burden of proof, if corroborating evidence is understood to be limited to expert medical testimony . . . In any event, we note that other forms of corroborating evidence may suffice -- and, in this case, do suffice -- to corroborate a debtor's claim of undue hardship based on illness. Medical bills, letters from treating physicians, and other indicia of medical treatment aside from medical records or expert medical testimony may corroborate a debtor's claim of undue hardship based on the debtor's health.

Id. at 360, 361 (quotation marks omitted). The court held that there was sufficient evidence in the record to support the bankruptcy court's finding that the debtor met the second Brunner prong because (1) even though the debtor was not permitted to testify regarding his prognosis and the causes of his conditions, the debtor was permitted to competently testify as to his diagnosis of avascular necrosis and the effects his health had on his life and ability to work, (2) the debtor offered a letter from his treating physician corroborating his diagnosis of Hodgkin's and his treatments, and (3) the debtor's tax returns corroborated his testimony regarding the limitations his health imposed on his ability to earn an income. Id. at 360-63.

Here, like the debtor in Barrett, Plaintiff has a long history of medical issues. Plaintiff was diagnosed with Crohn's disease in 1990. (Pl.'s Resp. to Def.'s Interrogs. No. 21, ECF 32-1.) Plaintiff had 3 surgeries within a 2-year period and now she has a permanent ileostomy. (Id.) Because of her condition, Plaintiff must use an ostomy bag, which requires constant cleaning to prevent infections. (Id.) Cleaning the ostomy bag is a time-consuming process, and the bag can break or come loose at any time without warning. (Id.) To make matters worse, Plaintiff was diagnosed with thyroid cancer in 2008. (Id. at 21, 23.) Plaintiff's cancer returned in 2009 and 2012. (Id.) Plaintiff's diagnosis of Crohn's disease and thyroid cancer, and complications from same, are corroborated by a letter from her treating physician, Dr. Michael M. Van Ness, dated July 19, 2019. (Pl's Aff. 10, ECF 33; Ex. D9 to Pl's Resp., ECF 45, at p. 7; see also Ex. A to Pl.'s Resp., ECF 34.) See Barrettt, 487 F.3d at 362.

Plaintiff's medical issues, especially her struggles with Crohn's disease, have largely prevented her from improving her economic lot in life. Because of her illnesses, Plaintiff has had difficulties consistently holding down a job. (Pl.'s Resp. to Def.'s Interrogs. Nos. 21, 24, ECF 32-1; Pl's. Aff. 8, ECF 33; Ex. B to Pl.'s Resp. ECF 35.). Employers have found Plaintiff unreliable because of her constant need to attend to medical emergencies. (Pl.'s Resp. to Def.'s Interrogs. No. 21, ECF 32-1.) For example, Plaintiff will occasionally suffer infections around her stoma, which prevent her from wearing her ostomy bag and leaving her home. (Id.) In addition, Plaintiff's ostomy has closed up dozens of times causing bowel obstructions. (Id.) Fortunately for Plaintiff, she has been able to work at Discount Drug Mart for over a year, working close to 40 hours per week. (Id. at 24.) But Plaintiff is physically unable to work any more hours than this. (Id.) As recently as March of this year, Plaintiff had to take a medical leave of absence from work because she is immunocompromised and therefore at an increased risk of contracting COVID-19. (Pl.'s Aff. 1, 2, ECF 61, citing Ex. F. to Pl's. Mot.)

9

Plaintiff also submitted copies of Wage and Income Transcripts from the Internal Revenue Service from 2011 to 2018, which demonstrate her low income over the years. (Pl.'s Aff. 9, ECF 33; Ex. C to Pl.'s Resp., ECF 36.) According to the transcripts, Plaintiff earned the following amounts in wages, tips, and other compensation: $19,615 in 2011, $14,568 in 2012, $7,579 in 2013, $4,289 in 2014, $4,640 in 2015, $9,789 in 2016, $18,788 in 2017, and $13,966 in 2018. (Ex. C to Pl.'s Resp., ECF 36.) Plaintiff's uncontested tax documents corroborate her assertion that her health conditions have imposed limitations on her ability to earn more income. See Barrettt, 487 F.3d at 362.

There is no indication that Plaintiff's circumstances are within her control or borne of free choice. ECMC correctly points out that Plaintiff withdrew from the online program at Rio Salado in part because she thought the program would not have helped her obtain a job that would allow her to repay her loans. (See Pl.'s Resp. to Def.'s Interrogs. No. 24, ECF 32-1.) Plaintiff should have conducted a cost-benefit analysis of the program prior to enrolling. But Plaintiff also withdrew from the program because of her health, and Plaintiff did not choose to be diagnosed with Crohn's disease. (Pl.'s Aff. 1, 2, ECF 33.) Plaintiff has no higher education. Nor does Plaintiff have apparent job skills that would allow her to obtain a higher paying job. Cf. Oyler, 397 F.3d at 386 (debtor failed second Brunner prong because he had experience and education to qualify for higher-paying work yet voluntarily chose to work as a pastor of a small church). Plaintiff is physically unable to work more than 40 hours per week at a drug store (and even this is a challenge, as demonstrated above). As explained earlier, Plaintiff relies on the generosity of her parents to maintain a civilized existence.

Even when construing the facts in favor of ECMC, Plaintiff's long medical history and limitations on her ability to work consistently are indicative of a certainty of hopelessness. Furthermore, Plaintiff's circumstances are beyond her control. Therefore, Plaintiff satisfies the second Brunner prong.

### 3. Plaintiff Has Made Good Faith Efforts to Repay Her Student Loans[14]

In this context, good faith "'is essentially an inquiry into whether the debtor has consciously or irresponsibly disregarded his or her repayment obligation—or, instead, whether there is some justification for the debtor's default and ongoing inability to repay the loan.'" Trudel v. U.S. Dep't of Educ. (In re Trudel), 514 B.R. 219, 228-29 (B.A.P. 6th Cir. 2014) (quoting Crawley v. Educ. Credit Mgmt. Corp. (In re Crawley), 460 B.R. 421, 444 (Bankr. E.D. Pa. 2011)). "Courts consider a number of factors to determine good faith, including the debtor's repayment history and her efforts to obtain employment, maximize income, minimize expenses, and participate in alternative repayment programs, though no single factor is dispositive." Trudel, 514 B.R. at 229 (citations omitted). "Inherent in any good-faith analysis under the third prong of the Brunner test is whether and the extent to which the debtor actually made any voluntary payments on the obligation." Trudel, 514 B.R. at 229 (citations, quotation marks, and alteration omitted). Moreover, "an inquiry into a debtor's good faith should focus on questions

---

[14] Some of the facts and discussion hereinafter may be relevant to the points raised above and vice versa.

surrounding the legitimacy of the basis for seeking a discharge. For instance, a debtor who willfully contrives a hardship in order to discharge student loans should be deemed to be acting in bad faith." Educ. Credit Mgmt. Corp. v. Polleys, 356 F.3d 1302, 1310 (10th Cir. 2004).

In the instant case, it is not clear whether Plaintiff has made any payments on her loans. (See ECMC Supp. Br. 6., ECF 52.). For purposes of summary judgment, the court will assume that she has not. It also appears that Plaintiff has made no attempts to participate in an alternative repayment program, such as an IDR plan. [15] (Id.) Plaintiff argues that she never had the ability to repay her loans, citing her low income over the years. (See Pl.'s Aff. 9, ECF 33; Ex. C to Pl.'s Resp., ECF 36.) However, Plaintiff also contends that a family member had offered to repay her loans in a lump sum at one point, but Plaintiff was unable to determine how much she owed and where to send payments. (Pl.'s Aff. 7, ECF 33; Ex. A to Pl's. Resp., ECF 34.) Plaintiff's failure to make any payments and failure to participate in an alternative repayment program cut against a finding of good faith. But neither of these facts are dispositive, as explained further below.

Plaintiff has less than $30,000 in debt from student loans she took out roughly 13 years ago to participate in an online program that she did not finish in part because of her health. Compare Pierson v. Navient (In re Pierson), No. 17-3096, 2018 Bankr. LEXIS 3106, at *27 (Bankr. N.D. Ohio Oct. 4, 2018) (finding good faith for debtor who filed bankruptcy petition nearly 20 years after college and had approximately $15,053.06 in student loan debt), with Malone v. Higher Educ. Student Assistance (In re Malone), 469 B.R. 768, 777 (Bankr. N.D. Ohio 2012) (finding lack of good faith for debtor who only made 1 payment and filed bankruptcy petition less than 1 year after graduation). Plaintiff did not obtain a certificate, license, or degree from the program, nor did she acquire any job skills or training that she could use to increase her income. Cf. Flores v. U.S. Dep't of Educ. (In re Flores), 282 B.R. 847, 856 (Bankr. N.D. Ohio 2002) (finding lack of good faith for debtor who made no payments and who obtained "very real and tangible benefit from her student loan obligation" given that her education helped her obtain her present job); Marlow v. U.S. Dep't of Educ. (In re Marlow), No. 11-3221, 2012 Bankr. LEXIS 4785, at *55, 56 (Bankr. E.D. Tenn. Oct. 10, 2012) (finding lack of good faith for debtor who was not maximizing his income and who obtained tangible benefit from student loans in the form of 4 degrees).

---

[15] Regarding this fact, it is important to keep in mind that:

> The U.S. Department of Education regulations provide that under an income-contingent repayment plan, a debtor is obliged to make some payment once the debtor's income exceeds the federal poverty level. However, the federal poverty level is below a 'minimal' standard of living. Therefore, the repayment program is based on a standard different from that found in section 523(a)(8) and cannot be determinative. Courts must also be careful not to treat the enactment of the statute authorizing the U.S. Department of Education to accept an income-contingent repayment plan as an implied repeal of section 523(a)(8) of the Bankruptcy Code.

4 COLLIER ON BANKRUPTCY ¶ 523.14[3] (Richard Levin & Henry J. Sommer eds., 16th ed.) (citations omitted).

The year after Plaintiff obtained her student loans, she was diagnosed with thyroid cancer and her husband left her. (Pl.'s Resp. to Def.'s Interrogs. No. 23, ECF 32-1.) Due to these circumstances, Plaintiff's loans understandably went into default. See, e.g., Trejo, 2020 Bankr. LEXIS 1030, at *24 (finding good faith for debtor who defaulted because she had to leave workforce to care for daughter with declining health and who had little ability to increase income due to lack of education, job skills, training, and experience). Nevertheless, Plaintiff has attempted to maximize her income over the years by working as much as she physically can, yet she still must rely on her parents to pay for necessary expenses. Taken together, these facts demonstrate that Plaintiff has acted in good faith. Indeed, it cannot be said that Plaintiff "willfully contrived a hardship" in order to discharge her student loans. See Polleys, 356 F.3d at 1310.

## VI. CONCLUSION

The main reason Congress enacted § 523(a)(8) was to prevent debtors from taking on large amounts of student loan debt, reaping the economic benefits of their loans, and then immediately seeking to discharge the debt in bankruptcy. Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman), 25 F.3d 356, 359 (6th Cir. 1994) (citation omitted). But the mischief Congress sought to prevent through § 523(a)(8) is plainly not present in this case. In addition, Plaintiff satisfies the Brunner test. Therefore, a discharge of her student loan debt is warranted.

The court will grant Plaintiff's Motion by separate order.

**Service List:**

Edwin H. Breyfogle
108 Third Street NE
Massillon, OH 44646

Neil Schor
Harrington, Hoppe & Mitchell Ltd.
26 Market Street Suite 1200
Youngstown, OH 44503